IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MILOSLAV MULLER,

        Plaintiff,

vs.                                                    CIVIL NO. 13-351 LFG/RHS

THE ISLANDS AT RIO RANCHO
HOMEOWNERS ASSOCIATION;
and ASSOCIA CANYON GATE
REAL ESTATE SERVICES, AAMC,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION TO DISMISS

THIS MATTER is before the Court on the "Motion to Dismiss ("Motion") on Behalf of Defendants The Islands at Rio Rancho Homeowners Association ("Islands' Association") and Associa Canyon Gate Real Estate Services, AAMC" ("Associa Canyon") or ("Defendants") [Doc. 14]. Defendants seek dismissal of Plaintiff Miloslav Muller's ("Muller") First Amended Complaint [Doc. 5] ("FAC") and this lawsuit for failure to state a claim under Fed. R. Civ. P. 12(b)(6).[1]  The Court considered the pertinent legal standards along with the Motion, Muller's Response [Doc. 15], and Defendants' Reply [Doc. 19]. Pursuant to D.N.M.LR-Civ. 7.6(a), the Court decides this matter on the parties' submissions.[2]

---

[1] It is not always clear but Defendants' Motion sometimes may refer to paragraph numbers in Muller's initial Complaint [Doc. 1] rather than to the FAC. The Court refers to allegations in the FAC as it is controlling.  *See* Mink v. Suthers, 482 F.3d 1244, 1254 (10th Cir. 2007) ("[A]n amended complaint super[s]edes an original complaint and renders the original complaint without legal effect." ), *cert. denied,* 552 U.S. 1165 (2008) (internal quotation marks omitted)).

[2] The parties consented to have the undersigned Magistrate Judge serve as the presiding judge and resolve any dispositive motions.

**Background**

Muller, a *pro se* litigant, brings this lawsuit under 42 U.S.C. § 1981 and the New Mexico Tort Claims Act ("TCA"), NMSA §§ 41-4-1 *et seq.* [Doc. 5.] Muller is the owner of a townhouse at the Islands at Rio Rancho, an adult retirement community.³ [FAC, at ¶ 8.] The Islands' Association is a non-profit, charitable corporation formed for the common benefits of owners and residents of over 100 townhouses built on the Islands' at Rio Rancho premises. [Id., at ¶ 9.] On August 1, 2011, Associa Canyon, a professional management company, assumed managerial duties of the premises. [Id., at ¶ 12.]  Muller attempts to set out three separate causes of action in his 35-page, 169-paragraph FAC. However, he actually asserts two claims, supported by different and sometimes, overlapping allegations: (1) retaliation in violation of § 1981; and (2) defamation in violation of the TCA, NMSA § 41-4-12. Generally, the FAC alleges that in 2009, Muller was engaged in "protected activity," and that due to that protected activity, Defendants retaliated against him in violation of § 1981 and defamed him in violation of the TCA. Muller alleges that Defendants' retaliatory actions caused "significant tangible damage," including damages to his townhouse that exceed $15,000. [Id., at ¶ 160.] Muller seeks an award of compensatory and punitive damages, and contends that Defendants' actions inflicted serve emotional distress, anguish and humiliation, resulting in "irreparable harm to his health and well-being." [Id., at ¶¶ 34-35, 169.]

---

³Defendants filed a motion to dismiss in lieu of an Answer. For purposes of deciding the motion, the Court presumes that all well-pleaded allegations are true.

In the background portion of the FAC, Muller alleges that the Islands' Association contracted with a company, Shamrock Landscaping ("Shamrock") that employed an African-American employee. [Id., at ¶ 18.] According to Muller, he observed the African-American Shamrock employee spraying toxic pesticides from his backpack without any protective equipment at the Islands' at Rio Rancho lake shore during high winds. [Id., at ¶ 19.] Muller states "[i]t strongly appears" that Shamrock used only "unsuspecting African-Americans" for such work because the rest of Shamrock's employees working on the premises were Caucasian. [Id., at ¶¶ 28, 34.] Muller argues this fact alone "raises an inference of intentional and willful racial discrimination of African-Americans" by Shamrock, and by the Board of Directors of the Islands' Association. [Id., at ¶ 29; *see also* ¶ 33 (Shamrock had no required pesticide license and hired unsuspecting, untrained, and unlicensed African-American males to perform extremely dangerous work in violation of applicable laws).]

Muller then alleges that he reported this "environmental and public health incident" on April 14, 2009, to the Pesticides Enforcement Manager of the New Mexico Department of Agriculture ("NMDA"). Muller asserts that the incident implicated the Board of Directors of the Islands' Association of racism and that his report constituted protected activity. [Id., at ¶ 17.]

### A.     **First Cause of Action (Retaliation)**

About a year later on April 14, 2010, Muller asserts that Defendants retaliated against him in connection with his April 2009 report by failing to provide proper information about the location of a "street emergency water shut-off valve[s]" to employees of People's

3

Plumbing, a company working at Muller's residence. [Id., at ¶ 43.] As a result of this failure by the Islands' Association's manager, Mrs. Fossenier and her husband ("the Fosseniers"), "approximately 600 gallons of water under at 80 psi pressure poured from the damaged water line . . . for approximately fifty minutes, flooding all rooms and all air ducts . . . ." [Id., at ¶ 44.] The Fosseniers' alleged failure to provide the necessary emergency information resulted in damages exceeding $15,000 to Muller's home that were not covered by his homeowner's insurance policy. [Id., at ¶ 45.]

Muller contends that the Fosseniers were fully aware of Muller's earlier complaint to the NMDA and that they received a copy of the investigative report regarding the April 2009 incident. [Id., at ¶ 53.] Muller argues that the April 14, 2010 shut-off valve problem was the "first available opportunity" for the Islands' Association to retaliate against him for his earlier report of racism. [Id., at ¶ 54.] Miller further asserts that other owners of property on the premises were treated differently than he was based on his awareness that the Islands' Association promptly resolved those individuals' identical issues of water damage and flooding. [Id., at ¶ 56.]

Based on the foregoing allegations, Muller alleges that he established a *prima facie* case of retaliation because he engaged in a statutory protected activity, suffered an adverse action, the Islands' Association was aware of Muller's protected activity, and there was a causal connection between the protected activity and the adverse action. [Id., at ¶ 61.]

**B.     Second Cause of Action (Retaliation and Defamation)**

Muller complains that on June 2, 2011, the Islands' Association experienced a second major environmental and public health incident caused by another landscaping company, the Grounds Guys. [Id., at ¶ 66.] During this incident, Muller alleges that a Grounds Guys' employee sprayed unknown pesticides into an adjacent lake during high winds, resulting in hundreds of fish dying and contamination of the Albuquerque aquifer. [Id., at ¶ 67.] On June 6, 2011, Muller contacted the New Mexico Environment Department about this incident. [Id., at ¶ 69.] Muller contends that the state agency refused to investigate the incident.[4] [Id., at ¶ 72.]

Muller alleges that about one month after his reports, the Islands' Association issued a one-page "unsigned" letter addressed to Muller, left at the door of his residence. [Id., at ¶ 77.] The letter provided a statement about Grounds Guys' qualifications and licensure and informed Muller of their scheduled work. The letter advised Muller that the Islands' Association would contact the police if there was any kind of harassment or interference by Muller. The letter, as noted by Muller, did not contain a handwritten signature but did show the signatory was "The Islands Board of Directors." [Id., at ¶ 78.] Muller claims that this letter was written in "obvious retaliation" for his earlier reports both in April 2009 and June 2011. [Id., at ¶ 77.]

---

[4]Muller attached a number of photographs and other materials to his FAC that the Court did not review. Instead, the Court presumed Muller's factual allegations to be true as required by Rule 12(b)(6).

Muller contends that the letter had a "chilling effect" on him because it was made "for improper purpose [sic] to defame him and to retaliate against him for his statutory protected April 2009 activity. . . ." [Id., at ¶ 83.] Muller argues this was the second opportunity for the Islands' Association to retaliate against him. [Id., at ¶ 84.] Muller also asserts that the Islands' Association's Board of Directors published and distributed the letter in "callous disregards [sic] for [Muller's] fundamental rights to be free from retaliation and defamation. . . ." [Id., at ¶ 86.] Muller described the alleged conduct as that which would shock the conscience. [Id.]

### C.   **Third Cause of Action (Retaliation and Defamation)**

Muller alleges that the Islands' Association hired a new management company, Associa Canyon, on August 1, 2011. [Id., at ¶ 110.] About eight months later, on April 12, 2012, Muller contacted Associa Canyon's director to request a repair of his "significantly damaged lawn from the previous year." [Id., at ¶ 111.] Muller wished to sell his townhouse and wanted to make his lawn more presentable. Muller explained in his request to Associa Canyon that his lawn was damaged by improper application of pesticides in June 2011. [Id., at ¶ 113.] Associa Canyon allegedly refused to respond to Muller's request.

On May 22, 2012, the Islands' Association's attorney sent Muller a "harassing and intimidating" letter that contained false and defamatory statements about Muller. [Id., at ¶ 116.] The falsities included representations that Associa Canyon could not find evidence of wrongdoing by the Grounds Guys during the June 2011 incident and that the Grounds Guys applied chemicals that were safe and applied them according to all regulations. [Id., at ¶

6

117.] Muller claims this letter amounted to a cover-up of the Grounds Guys' unlawful acts and omissions. The letter also stated that Muller's grass was dying due to lack of water. [Id., at ¶¶ 118, 119.]

Muller alleges that the letter further advised him that, in May 2012, the Grounds Guys re-seeded the damaged lawn. Muller asserts that the re-seeding did not restore the pesticide-damaged lawn "at all." [Id., at ¶ 125.] Muller provides evidence of additional alleged retaliatory statements in the letter, including that Associa Canyon received multiple reports that Muller engaged in activities that were at odds with living in a community setting or that were damaging to the Islands' Association's property. Muller, according to the letter, allegedly was reported as having been verbally and/or physically abusive to the Grounds Guys' employees and others. [Id., at ¶ 127.] Associa Canyon noted other purported reports of problematic behavior by Muller. The letter provided that Associa Canyon had concluded its investigation of Muller's complaint submitted on April 12, 2012, and would take no further action on the complaint. [Id.]

Muller asserts that the information in this letter was false and defamatory and that he asked for documentary evidence supporting Associa Canyon's "serious accusations" about him. Muller sets out correspondence he sent to Associa Canyon's president about his complaints. [Id., at ¶ 131.] He made additional accusations of a racially motivated incident that occurred on May 19, 2012. This encounter involved a worker hired by Muller's neighbor who allegedly told Muller to stop bothering her employees. [Id., at ¶ 132.]

7

In relation to additional complaints and inquiries by Muller, the Island Association's attorney wrote a second letter to Muller, dated June 15, 2012. The Island Association refused to undertake any additional investigation into Muller's complaints. [Id., at ¶ 140.]

On July 25, 2012, Muller wrote to a vice-president of Associa Canyon, requesting that a scheduled pesticide spraying on the next day not occur. Associa Canyon responded the following day, stating it would make an exception not to spray pesticides on that particular date, but that its use of pesticides complied with regulations. Muller claims this statement was false and misleading and that the statements about proper use of pesticides were "simply unbelievable and conscience shocking." [Id., at ¶¶ 146, 147, 151.] Muller again contacted the vice-president of Associa Canyon but did not receive a response.

On August 22, 2012, counsel for Islands' Association wrote Muller again, informing him that no further action would be taken on the issue of pesticide use. Counsel also advised Muller that in the future if legal counsel was required to respond to him, the cost of doing so would be charged as an assessment to him. [Id., at ¶ 154.] Muller alleges that this was an "obvious attempt to harass, intimidate, and scare" him from pursuing his protected civil rights. Muller also contends that these letters in 2012 constituted adverse actions and that they were causally connected to the 2009 complaint about Shamrock's employee. [Id., at ¶¶ 158-59.]

## Motion to Dismiss

Defendants assert that Muller's FAC fails to withstand scrutiny under the current pleading requirements of Fed. R. Civ. P. 12(b)(6) and the United States Supreme Court's

8

rulings in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1970 (2007) ("Twombly") and Ashcroft v. Iqbal, 556 U.S. 662 (2009) ("Iqbal"). Defendants specifically seek dismissal for two reasons: (1) Muller failed to assert a proper cause of action under 42 U.S.C. § 1981; and (2) Muller's defamation allegations fail to state a cause of action under the New Mexico Tort Claims Act. In sum, Defendants argue that the FAC must be dismissed for failure to state a claim. [Doc. 14, at 2.]

Muller argues that the Motion is based on an "erroneous interpretation of facts, statutes, and controlling legal precedents." [Doc. 15, at 3.] He attempts to add "undisputed facts" taken from the Homeowners Association's Declaration of Covenants, Conditions, and Restrictions, and attaches exhibits to his response. While the Court may consider exhibits to a complaint without converting a motion to dismiss to one for summary judgment, the Court would have to re-cast the Motion as one brought under Rule 56 if it considered the materials attached to Muller's response. The Court elects to review this Motion as one brought under Rule 12(b)(6), and, therefore, does not consider exhibits to Muller's response.

## **Legal Standard**

A Rule 12(b)(6) motion tests the sufficiency of the pleading. A court may dismiss a complaint under Rule 12(b)(6) if the claims assert a legal theory that is not cognizable as a matter of law or because the factual tale alleged is implausible. *See* Twombly, 550 U.S. at 555, 570. The Court presumes that all well-pleaded allegations are true and resolves all reasonable doubts and inferences in the pleader's favor. Id. at 555. Yet, the federal pleading

duty is far from trivial. *See* Iqbal, 556 U.S. at 678-79 (Rule 8 requirements "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.")

In 2007, a more forgiving pleading mantra was replaced when the Supreme Court issued its decision in Twombly. Now, for a complaint to survive scrutiny under Rule 12(b)(6), it must supply allegations that push the claims above the level of mere speculation. Such plausibility must now appear affirmatively on the face of the pleading. In other words, a pleader must do more than merely incant labels, conclusions, and the formulaic elements of a cause of action. Iqbal, 556 U.S. at 677-678; Twombly, 550 U.S. at 555. Nor does the Court accept as true bald assertions, conclusions, inferences, or legal conclusions couched or masquerading as facts. Twombly, 550 U.S. at 555. The pleader must show that his allegations "possess enough heft" to establish an entitlement to relief. Stated differently, the pleader must "nudge[] [his] claims across the line from conceivable to plausible." Id., at 570. Thus, it is no longer sufficient to assert that a claimant has been wronged and is entitled to relief.

Because Muller proceeds *pro se,* the Court construes his pleadings liberally. *See* Erickson v. Pardus, 551 U.S. 89, 94 (2007). "[T]his rule of liberal construction stops, however, at the point at which we begin to serve as his advocate." United States v. Pinson, 584 F.3d 972, 975 (10th Cir. 2009), *cert. denied*, 559 U.S. 955 (2010).

## Analysis

### A.     Title 42 U.S.C. § 1981 Claim

Section § 1981 was enacted in the reconstruction era and appears in the Civil Rights Act of 1866. The legislation granted citizenship to freed slaves and provides the following guarantee.

> All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

Section 1981 was enacted to shore up uncertainty that existed after the Civil War and the adoption of the Thirteenth Amendment, which formally abolished slavery. In CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008), the Court held that §1981(a) encompassed retaliation claims. Id. at 457. The Court further explained that § 1981 guarantees "[a]ll persons . . . the same right . . . to make and enforce contracts . . . as enjoyed by white citizens." Id. at 445. Such claims are limited to "retaliation against a person who has complained about a violation of another person's contract-related 'right'." Id. (emphasis added). In Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 475 (2006), the Supreme Court described § 1981(a) as protecting "the right—denied in some States to blacks, as it was denied at common law to children—to give and receive contractual rights on one's own

behalf." Thus, "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship . . . .'" Id. at 476.

Thus, for Muller's § 1981 retaliation allegations to survive, he must allege that a person's contract-related right was violated on account of racial motivation. Muller has not alleged a violation of any person's contract-related right. At most, Muller contends that the Island's Association hired a contractor, Shamrock, which, in turn, hired an African-American employee and required that employee to perform tasks, spraying pesticide without equipment or training, unlike duties assigned to white employees. There is nothing in Muller's FAC that touches on any alleged impairment of a contract between Shamrock's African-American employee and any action taken by the Island's Association in reference to Shamrock's treatment of its employees. For this reason alone, the § 1981 claim is subject to dismissal under Rule 12(b)(6).

In Muller's response, he attempts to correct this deficiency by alleging the existence of various contractual relationships between entities and by contending that he had contractual rights with the Islands' Association. [Doc. 15, at 5-7, 13-14.] The Court finds Muller's arguments concerning alleged contractual relationships or "service contracts" to be unpersuasive.

Even if Muller made the requisite showing that a contract-based right was impaired, the § 1981 retaliation claim fails for other reasons as well. To establish a *prima facie* retaliation case under § 198, Muller must show that "(1) he engaged in protected opposition to discrimination; (2) a reasonable employee[/complainant] would have found the challenged

action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *See* Somoza v. Univ. of Denver, 513 F.3d 1206, 1212 (10th Cir. 2008) (analyzing retaliation claims at summary judgment stage).[5]

Here, in liberally construing the FAC, Muller's allegations that he engaged in protected opposition to discrimination are speculative at best. Even he states that it "strongly appears" that Shamrock used only "unsuspecting African-Americans" to do the objectionable or discriminatory work. [Doc. 5, at ¶¶ 28, 34.] Such allegations of strong suspicion do not "push the claim above the level of mere speculation." In addition, Muller does not allege why he supposedly knew that the single African American employee was somehow "unsuspecting." Such meager allegations, even if spread out over dozens of paragraphs, do not evince unlawful discrimination or protected activity on Muller's part.

Muller's allegations related to having engaged in a "protected activity" are more akin to bald assertions or legal conclusions masquerading as facts. Muller contends that he notified the Islands' Association that a Shamrock employee was being treated differently than white employees, but again the allegations arise from Muller's speculation because Muller does not and cannot allege that he observed all of, or even a majority of Shamrock's employees to determine what duties they were and were not assigned. Instead, he only claims that on one day, he observed a single Shamrock African American employee engaged in spraying pesticides while an unspecified number of white employees were not. Such

---

[5]In Somoza, the Tenth Circuit analyzed retaliation claims brought under Title VII and § 1981, nothing that the prima facie elements were the same under either statute. Id. at 1211-12.

13

allegations are too attenuated and speculative to state a claim under the requirements of Twombly and Iqbal.

With respect to the second element of the retaliation claim, Muller contends that a year after his complaint concerning Shamrock's African American employee's job duties, he suffered an adverse action when the Islands' Association's failed to advise Muller's plumbing company where the water shut-off valve was located. The failure allegedly resulted in flooding and damage to Muller's property. Even presuming this inaction and Defendants' later letters to Muller were adverse actions, which is doubtful, Muller's allegations are insufficiently speculative to satisfy the required causal connection between the purported protected activity and the adverse action.

Muller tries to avoid the obvious problem with the causal connection requirement by urging that the June 2010 incident was the "first opportunity" the Islands' Association had to retaliate against him for the 2009 complaint. And, he argues the same thing with respect to the 2011 incident – it was causally connected to his 2009 complaint because it was the "second opportunity" for the Islands' Association to adversely affect him. The same is true for Muller's complaints in 2012 and the letters he received from Defendants' law firm. He alleges *inter alia*:

> While there is a temporal proximity of approximately three years between the Plaintiff's statutory protected activity in 2009 and the April, May, and August 2012 Defendants' adverse action against Plaintiff that is ordinarily considered too long to prove a causal connection, in accordance with multiple legal precedents, an exception applies to this situation because all

> those multiple adverse actions were another and also continuous opportunities to retaliate against the Plaintiff.

[Doc. 5, at ¶158.] Muller then posits that the April 14, 2009 statutory protected activity was the "sole contributing factor for Defendants' multiple adverse actions . . . that would not have occurred but for the Plaintiff's lawful objection to the violations of civil rights of African-Americans that implicated The Islands' management from racism." [Id., at ¶ 159.]

It is well-settled law in retaliation cases that even three to four months between alleged protected activity and adverse actions are too remote to demonstrate a causal connection. *See, e.g.,* E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1051 (10th Cir. 2011) (one year gap between protected activity and adverse action too long); Proctor v. United Parcel Service, 502 F.3d 1200, 1208 (10th Cir. 2007) (four months too large a time gap to establish a causal connection); Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (gap of more than three months between the protected activity and the adverse action is too long a period, absent other evidence, to demonstrate the causal connection required to establish a *prima facie* case of retaliation); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three-month gap between protected activity and termination was not close enough to establish causation in light of all the facts); Alvarado v. Donley, 490 F. App'x 932 (10th Cir. July 13, 2012) (unpublished) (three-year gap between protected activity and adverse action too long to support causal connection); Boese v. Fort Hays State Univ., 462 F. App'x 797 (10th Cir. Feb. 9, 2012) (unpublished) (seven-month gap too long).

Stated differently, in order to demonstrate causal connection, the time between the protected activity and adverse action must be very close unless there are additional allegations "beyond temporal proximity to establish causation." *See* Anderson, 181 F.3d at 1179. Muller made additional allegations in support of his position that he established a causal connection, *e.g.,* that "similarly situated residents" received more favorable treatment in terms of services, than Plaintiff or "Plaintiff's statutory protected group," and that the Board of Directors of the Islands' Association and Associa Canyon's management significantly departed from their own policies and state and federal laws. [Doc. 5, at ¶ 158(a)(b).] Such allegations or purported evidence shed no light on the issue of temporal proximity. It defies credulity that the Islands' Association was lying in wait for a year, two years or three years to take some sort of action against Muller. Even construing the allegations liberally in favor of the *pro se* litigant, a one-year plus lapse between the alleged protected activity and the adverse actions is far too remote to establish causation in light of all the allegations.

For all of the above-stated reasons, the allegations in support of the § 1981 claim fail to meet the pleading requirements of Twombly or Iqbal. Therefore, the Court will dismiss Muller's § 1981 claim with prejudice under Rule 12(b)(6).

**B.     New Mexico Tort Claims Act ("TCA") Claim**[6]

Muller alleges a claim of defamation under NMSA § 41-4-12 and specifically invokes § 41-4-12 throughout his FAC. [Doc. 5, at 1, 12, 20, and ¶¶ 85, 103, 106(b).] That provision of the TCA notes that immunity granted under § 41-4-4 does not apply to liability for defamation of character, among other injuries, "when caused by law enforcement officers while acting within the scope of their duties." NMSA § 41-4-12. Neither the TCA, nor ¶ 41-4-12, are applicable here. Nothing in Muller's FAC alleges that Defendants are public employers governed by provisions of the TCA or that law enforcement officers are involved.

Because he proceeds *pro se*, the Court liberally construes Muller's claim of defamation as one brought under State common law. Under New Mexico law, the tort claim of defamation is defined as "a wrongful and unprivileged injury to a person's reputation." Hagebak v. Stone, 133 N.M. 75, 77-78 (Ct. App. 2002); UJI 13-1001 NMRA (2013 ed.) (defining defamation). The *prima facie* elements of a defamation cause of action are: (1) defendant published the communication; (2) the communication contains a statement of fact; (3) the communication concerned the plaintiff; (4) the statement of fact was false; (5) the communication was defamatory; (6) the person receiving the communication understood it to be defamatory; (7) the defendant knew the communication was false or negligently failed to recognize that it was false; (8) the communication caused actual injury to the plaintiff's reputation; and (9) the defendant abused its privilege to publish the communication. UJI

---

[6]Defendants ask the Court to decline supplemental jurisdiction over the state law defamation claim if it dismisses the § 1981 claim. The Court finds it more efficient to address the defamation claim, and, therefore, exercises supplemental jurisdiction in deciding the claim.

13-1002(B) NMRA (2013 ed.) (listing elements of defamation action); *see also* Clough v. Adventist Health Sys., Inc., 108 N.M. 801, 806 (1989) (describing publication element of defamation).

There must be a publication to support a claim of defamation. Publication is defined as "an intentional or negligent communication to one other than the person defamed." UJI 13-1003. In addition, to support a defamation claim, there must be a statement of fact as opposed to an opinion, and the communication must be false in a material way. UJI 13-1004; UJI 13-1006. The definition of a defamatory communication is one which tends to expose a person to contempt, to harm the person's reputation, or to discourage others from dealing with the person. UJI 13-1007.

The FAC alleges that a July 2011 letter to Muller from the Islands' Association was defamatory. [Doc. 5, at ¶¶ 77, 78.] Muller takes issue with a sentence in the letter that advises him if there is any sort of "harassment, bullying or interference on your part the board feels it will be necessary to intercede for the safety of everyone concerned." [Id., at ¶ 78.] The letter informs Muller that the police could be called should there be harassment, etc. Muller claims the purpose of the letter was to defame him and that the letter was published, disseminated, and distributed. [Id., at ¶¶ 83, 85, 86, 87, 88, 89.] Muller further alleges that the statements in the letter were defamatory and that the Islands' Association failed to verify the truthfulness of the statements. [Id., at ¶¶ 89-91.]

While Muller provides conclusory allegations that Defendants published the letter, conclusory assertions or conclusions of law are insufficient. Muller actually alleges that

18

Defendants only provided him with the letter. Moreover, there are no statements, as recounted word-for-word in Muller's FAC, that are defamatory, nor does Muller allege what statements were false. The statements about which Muller takes issue are warnings. They are not statements of fact, other than to advise Muller that Islands' Association might contact the police if certain actions occurred. Because Muller's allegations do not satisfy all of the *prima facie* requirements of a defamation claim, the claim is subject to dismissal under Rule 12(b)(6).

Muller's other claims of defamation meet a similar fate. For example, Muller takes issue with a May 2012 letter issued to him by the law firm retained by Islands' Association. [Id., at ¶ 116.] Miller alleges that the letter was intimidating and harassing and contained statements that were materially false.

As examples of defamatory statements, Muller alleges that the letter stated Associa Canyon "was not able to find any evidence of wrongdoing on [the] part of The GroundsGuys during the June 2, 2011 incident; that The Ground[s]Guys is a professional company that [at] all times applied chemicals in accordance with all regulations; that applied chemicals were safe; that The GroundsGuys took proper precautions to prevent any chemicals from contaminating the lake; that The GroundsGuys complied with all applicable OSHA rules and regulations; and that The GroundsGuys [was a] responsible company." [Id., at ¶117.] Muller also contends that the statement concerning the causes of problems with Muller's lawn was false, and that statements about repairs done to Plaintiff's lawn were not accurate. [[Id., at ¶¶ 118-120, 124-25.] None of the identified statements meet the definition of defamation and

19

none concern Muller. In addition, Muller failed to allege publication of the letter to anyone but himself.

Muller also identifies portions of the letter that address reports Acacia Canyon received about Muller having engaged "in activities that are at odds with living in a community setting and/or are damaging to the property of the Association." [Id., at ¶ 127.] Again, Muller did not allege publication of the letter to anyone. Muller alleges multiple instances of defamatory statements, but when examined, none of the allegations satisfy all of the requirements of a defamation claim. In sum, the Court does not find that any of the alleged offensive statements meet the *prima facie* elements of a defamation claim. Accordingly, the Court determines that all defamation claims are subject to dismissal under Rule 12(b)(6).

## Conclusion

For the foregoing reasons, the Court finds that Defendants' Motion to Dismiss for failure to state a cause of action under § 12(b)(6) is well-taken with respect to all claims asserted in Muller's First Amended Complaint.

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss [Doc. 14] is GRANTED, with the result that Plaintiffs's First Amended Complaint and this entire matter are DISMISSED, with prejudice.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge